ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona

D.J. PASHAYAN
Ohio State Bar No. 0071260
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Email: Don.Pashayan@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR 17-01110-PHX-DLR |
|---|---|
| Plaintiff, | **UNITED STATES' MEMORANDUM IN SUPPORT OF DEFENDANT'S DETENTION PENDING TRIAL** |
| vs. | |
| Fany Madrigal-Lopez, | |
| Defendant. | |

The United States of America, by and through the undersigned counsel, hereby respectfully submits this memorandum and asks that the Court detain the defendant as a danger to the community pursuant to Title 18, United States Code, Sections 3142(e)(3)(A) and (f)(1)(C).

**1. The current charge and the rebuttable presumption in favor of detention**

In Count One of the Indictment, the Grand Jury charged the defendant with maintaining a drug dwelling between the summer of 2016 through November 16, 2016, that is, using her residence at 7336 West Vogel Avenue, Peoria, Arizona (the "West Vogel Avenue location"), for the purpose of distributing oxycodone and fentanyl, both Schedule II controlled substances. Doc. # 3. As to Count One, the defendant faces up to 20 years' imprisonment. *See* 21 U.S.C. Sections 856(a) and (b).

In Count Two, the Grand Jury charged the defendant with the distribution of fentanyl that caused the death of an individual (PL) on or about November 16, 2016. Doc.

# 3. As to Count Two, the defendant faces a 20-year minimum mandatory term of imprisonment and up to life imprisonment. *See* 21 U.S.C. Sections 841(a)(1) and (b)(1)(C).

As a result of these Controlled Substance Act charges, the rebuttable presumption in favor of detention applies in this case. *See* Title 18, United States Code, Section 3142(e)(3)(A).

**2. Section 3142(g) factors favor detention: nature of the case, background of the defendant, weight of the evidence, and danger to the community**

According to information gathered by the Drug Enforcement Administration (DEA), the defendant is a 45-year female who is a mother, a Mexican citizen with asylum status in the United States, is self-employed in the residential cleaning business, and has reside at the West Vogel Avenue location for some time.

In addition, according to witness interviews and a review of text messages in this case, the defendant had been supplying the victim, PL, with pills marked as "30s" since *at least* the summer of 2016. While "30" or "M-30" is often imprinted on blue-colored prescription oxycodone pills, the "30s" in this case were as mentioned below counterfeit oxycodone that contained the powerful drug fentanyl.

During the week of November 14, 2016, PL sent the defendant text messages and told the defendant that PL would be back in town by Thursday, November 17, 2016, and wanted to "grab 10 blue ones… [and to] [t]ry and save me the dark blue ones." *See* **Exhibit A**.

PL then arrived in Phoenix from California on the night of November 16, 2016. A relative picked PL up from the airport and immediately took PL to the defendant's West Vogel Avenue location. Although PL told this relative that he needed to retrieve some money from the West Vogel Avenue location, PL instead obtained the "blues" mentioned above. *Id.* Immediately afterwards, this same relative took PL to another relative's residence, where PL remained for the evening and was found deceased the following morning.

On November 17, 2016, the Maricopa County Medical Examiner (MCME)

responded to the relative's residence and found no money and 6 blue-colored pills in PL's wallet that were marked as "M-30." *See* **Exhibit B**.[1] As mentioned above, these pills appeared to be oxycodone. However, the DEA laboratory later analyzed these pills and determined them to contain fentanyl and other substances--- not oxycodone.

MCME later conducted an examination of PL and found fentanyl and other substances in PL's system. MCME determined, however, that PL died of "fentanyl intoxication."

According to witnesses, on November 17, 2016, the defendant learned of PL's death and appeared remorseful. That said, according to cellular telephone records obtained in this case, the defendant ceased utilizing the telephone that she had used to communicate with PL in this case (and subscribed in her *own* name) the *very* next day.

On November 18, 2016, the defendant spoke with her husband, an inmate at a U.S. Bureau of Prisons facility, and made the following statements in recorded calls:

> **Friday, November 18, 2016 6:13 a.m.**
>
> **Defendant to Jose:** *I know… today is Friday… [PL], Wednesday in the night…he was here, he was in California to be with his mother…we saw each other on Wednesday at night…he came here to say hello to us…he came here in a car and I asked him if you are driving... he said no and that his cousin brought him here and he just left the airport and came straight here…*
>
> **Jose to Defendant:** *What happened? Tell me.*
>
> **Defendant to Jose:** *He died yesterday*
>
> **Jose to Defendant:** *[PL]?*
>
> **Defendant to Jose:** *In the morning he was dead.*

---

[1] Other prescription pill bottles bearing the relative's name with whom PL was staying were found in the same room as PL's body.

These pills were not, however, fentanyl.

- 3 -

**Defendant to Jose:** *His sister has his phone and it has the text messages…I'm sorry for what happened but I'm worried.*

**Friday, November 18, 2016 1:22 p.m.**

**Defendant to Jose:** *…I sent a message yesterday to [PL] saying that Judy is joking around.*

**Jose to Defendant:** *Okay, did you send the message on Facebook?*

**Defendant to Jose:** *No to his phone, from the telephone. But from the telephone that you and I are talking on right now. All I put was "look at what they are saying about you" but from my telephone. I did call him twice and he didn't answer. But his cousin did call me on this telephone. He told me that he was his cousin. I asked him why was he [PL] wasn't answering. And I asked if it was true what everyone was saying. He [the cousin] said that it was true, they found him [PL] dead in the morning and that they found "**blues**" in his wallet and that his sister has his phone and saw the text messages. And obviously they weren't going to answer me because they knew who was calling them. They said it was the same number from the text messages. He called me to tell me that. But I never saw him, or talked to him. I asked him "Are you the one who was with him yesterday." He said "no, it was my cousin Jake" was the one who was with him yesterday. I asked him what they are doing with Philippe and all that, but obviously it's not good to talk to him. I just said yes, because he told me it was true, and I started to cry.*

**Jose to defendant:** *So you never met personally any of his [PL's] cousins?*

**Defendant to Jose:** *No, not even the one who came the day before yesterday because he stayed in the car.*

**Defendant to Jose:** *This hurts me, because we knew him….but also I'm worried for this…and I'm worried about those text messages.*

### 3. August 18, 2017: arrest of the defendant and search of the West Vogel Avenue location

On August 18, 2017, DEA and other law enforcement agencies arrested the defendant at the West Vogel Avenue location and executed search warrants there. In addition to the defendant, three of her children--- two of whom appeared to be of elementary school age--- were present at this time.

Post-Miranda, the defendant told DEA that she knew PL, that she was the "Fanny" in the text messages in **Exhibit A**, that she saw PL the night before PL died, and that she was the female speaking in the BOP calls above. That said, the defendant was unable to provide DEA with an explanation as to the meaning of the "blue pills" in the text messages and stated only that PL owed her some money for house cleaning and was always joking.

Thereafter, DEA located a safe in the defendant's master bedroom closet. Although the defendant told DEA she did not have the key to or could not open this safe, DEA located it on her very own key ring. Inside this safe, DEA then located different pills, to include some lighter colored blue pills marked as "M-30," a white-powdery substance, and a digital scale. *See* **Exhibit C.**

On that same key ring DEA found a key to a Honda Odyssey that was parked in the garage and was registered to the defendant. Inside of this Honda, DEA located a purse that contained more blue-colored "M-30" pills--- which appear virtually identical to those found in PL's wallet and were found to contain fentanyl as mentioned above. *See* **Exhibit D**. In addition to finding these pills in the Honda, DEA found other documentation in it bearing the defendant's name.

During the course of this search warrant, the defendant's son arrived at the West Vogel Avenue location and inquired if DEA was present because of PL's death, and, in essence, advised DEA that the defendant had been selling pills for some time to make ends meet. The defendant then scolded her son for speaking about PL and warned him to not discuss this matter.

In addition, DEA found approximately 5 cellular telephones in this residence, 3 of

- 5 -

1 | which were found in her bedroom and 2 more were found in the kitchen. Analysis of these phones is pending.

**4. Conclusion**

For the reasons set forth above, the defendant should be detained. While as mentioned above, the defendant does have some apparent strong ties to this community, the overall conduct in this case and weight of the evidence dictates that the defendant is simply a danger to the community.

First of all, the current charge is for a serious drug offense. It involves the defendant distributing oxycodone and fentanyl over an extended period of time, which caused the death of PL.

Second, the weight of the evidence is strong. In addition to the text messages, jail calls, witness information, telephone information mentioned above, and her post-arrest lie about her safe access and the admissions mentioned-above; the evidence in this case includes the seizure of drugs from the defendant's residence and car *approximately* 9 months after PL's death. This indicates that PL's death did not deter the defendant's conduct. Of note, her children were present during the search warrant at her residence---which is, again, a residence where pills were found.

As a result, the United States would request that the defendant be detained in this case as a danger to the community.

Respectfully submitted this 22nd day of August, 2017.

ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona

 */s/ D. J. Pashayan*
D. J. PASHAYAN
Assistant U.S. Attorney

# **CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing documents, and sent the attached document to the following CM/ECF registrant(s):

Maria Chin, Esq.
*Counsel for Defendant*

_s/D.J. Pashayan_
U.S. Attorney's Office